Please all rise. Hear ye, hear ye. This Honorable Appellate Court for the Second Judicial District is now back in session. Mr. Honorable Prosecutor and Attorney, please be seated. You may be seated. Your Honors, the final case in the dock this morning is 2-5-23-0020 The people of the state of Illinois, extra, on your own, from the general legislature of Illinois, petitioner and appellant, the Illinois Commerce Commission, at our respondents at the meetings. Arguing on behalf of the appellant, Mr. Benjamin F. Jamieson. Arguing on behalf of the appellees before the Commerce Commission, Mr. Brian J. Dodd. Arguing on behalf of the appellees, Honorable Edison, Ms. Monique Warden. All right, Mr. Jacobson, you may proceed when ready. Please feel free to adjust the microphone. Thank you, Your Honor, and may it please the Court. Assistant Attorney General Ben Jacobson on behalf of the people. The Commission's misguided interpretation of Section 45 of the Electric Vehicle Act is erroneous as a matter of law for three reasons. First, it erred by allowing non-transportation spending in BE plans. Second, it erred by allowing non-transportation spending in electric vehicles. Third, it improperly limited the scope of the retail rate cap to only direct spending on EV infrastructure. And third, it improperly expanded the pool of money for establishing the amount of that cap. Each of these errors is based on improperly parsing the plain language of Section 45. Combined, they effectively read out the spending cap and expand BE plans beyond what was intended by the legislature. The upshot of these errors is that ComEd can vastly expand the spending under BE plans and then improperly recover that money from its customers when the legislature specifically intended to limit the impact that these infrastructure upgrades are going to have on rate payers. Looking instead to the plain language of the statute as a whole, as we are required to do, the necessary conclusion is that the Commission got it wrong in each of these three ways. BE plans are exclusively for transportation-related spending. The retail rate cap applies to the entirety of the BE plan. The 1%. The 1%, yes, Your Honor. And in this specific context, total annual revenue requirements means ComEd's delivery services revenue requirements. Say that last one again. In this specific context, total annual revenue requirements means specifically ComEd's delivery services revenue requirements. So Council, ComEd submitted $4.7 billion. What was the figure that you're arguing ought to be that top-line number? It's around $2.8 billion. So the 1% comes out to approximately $28 million, Your Honor. And so aren't we discussing $15 million worth of transportation infrastructure that is being submitted here under the BE plan? Yes and no, Your Honor, because the interrelation between the total annual revenue requirements and that 1%, as the Commission has interpreted the language in 45G and 45 as a whole, they've allowed non-transportation spending in here, and in addition they've interpreted what counts as the development of EV infrastructure in a very narrow way. So, for instance, with the final approved plan, the final approved plan is about $77 million. Under the current interpretation, only $26 million of that is capped under 45G. The $6 million and $5 million that go to education and awareness for consumers and to development of pilot programs are not considered development of EV infrastructure, so they're out. And then the $38 million, I believe it's approximately $38 million, that is for the rebates and subsidies for the purchase of electric vehicles, are also not included, along with the, I believe it's under the final plan, the approximately $2 million that goes to the non-transportation spending that the Commission approved here. Do you want to talk about that part first? Yes, I'd love to, Your Honor, if that's what you're interested in. So, do you have a specific question? Yeah, you know, essentially I hear you saying what that, and I might get these categories wrong, but the reading that allegedly narrowed, too narrow reading of development of EV infrastructure really ought to be everything that's included, all the costs of their BEP. Yes, Your Honor. My question is why didn't the legislature just say that? Because to use the word infrastructure, you know, if I took the just plain meaning of it, it means things like hard capital improvements. That's not the right, you know, and that isn't going to turn up, you know, anywhere. That's just what pops out of my head. Development of EV infrastructure. It is narrow. I think the obvious intent of that is to narrow it beyond not everything that's in the BE plan because that would have been easy to say. So I think there's kind of two parts to this, Your Honor. The first is that if we look to the statute as a whole, which we're required to do when we're doing statutory interpretation. And how easy would it have been to say all the costs attributable to the BEP plan? The legislature could have, certainly, but they didn't need to because the full context that we see if we look at, you know, the ten goals that the legislature had in 45A for these plans, the ten considerations that the legislature wanted to be in the workshop process and the recommendation they wanted to come out of those in 45C, the ten elements that have to be in a BE plan, all of these are explicitly and exclusively focused on EV, on the infrastructure and transportation. And so, contextually, the clear meaning from looking to the statute as a whole was that developing EV infrastructure was the whole point of including Section 45 in CJA. So, for instance, you know, why do we need to increase the amount of physical infrastructure, the wires that are going from the plants to individuals' homes and businesses? It's because we're increasing the number of electric vehicles, which is going to increase the amount of electricity that's being used. And so the point of developing that infrastructure is because we're increasing the use of electric vehicles. And then the rate structures that are also discussed throughout the statute, the time of use rates, off-peak demand, all of these things are intended to ensure that the infrastructure is sufficient to meet the need. And that's development of infrastructure, too? Yes, Your Honor. Consumer education, all of them. Because the consumer education is to ensure that the consumers are aware of all of these rate structures, the access to the rebates that are in these programs, and the program as a whole. And I'm not saying that that wouldn't make a lot of sense, but I guess I start from the proposition that the legislature means what they say. Yeah, I understand that, Your Honor. And I think that, you know, by using the term development here, that they were intending to include all of the beneficial electrification plan. Because all of these pieces are interrelated, and they're focused on that same outcome, which is, you know, reducing pollution, getting electric vehicles on the road, and building up the infrastructure in order to meet that need, but at the same time limiting the impact that all this additional spending is going to have on rate payers. And under the interpretation that the commission has given it, we have a beneficial electrification plan that is almost entirely not subject to the cap, the hard cap that was placed in there by the legislature. And they included both this hard cap and the cost-benefit analysis to ensure that overall it was going to have benefits for society, but at the same time that hard cap indicates that they wanted to limit that impact on rate payers. Because at the end of the day, Con Ed is going to front this money, make these expenditures, and then be able to recover that from Illinois rate payers. Well, the commission did remove some what they consider non-transportation programs to alleviate, to help out the Attorney General's office or to satisfy the Attorney General's office with some of this. Why was that not enough? Because, Your Honor, that goes to the difference between what the agency is authorized to do by the statute and what they do with their discretion when they're granted that discretion under the statute. And here, non-transportation is not authorized to be included in the statute, by the statute, in these beneficial electrification plans. Again, I... What's the consequence of that? So let's say a non-transportation expense that would ordinarily, in your analysis, be under the Public Utilities Act is moved into a BE plan. What is the effect? What's the consequence financially? So in terms of the specific non-transportation spending that was at issue here, it's that it gets around the spending cap in the Public Utilities Act that was put in place by the legislature for those electrification efforts. This has to do with things like, I believe it's electric heaters and residential appliances of that sort. And the legislature, in 103-B-27, a lovely mouthful, they put a cap on the amount that ComEd was going to be able to put towards these goals, these energy efficiency goals. And when they meet these goals, they get effectively bonuses that increase their profit. So by allowing this kind of spending beyond what's been capped there, it is doing an end run around the legislature's explicit purpose to limit the amount that ComEd can spend on these efforts and then be able to recover those expenses from ratepayers. But didn't the commission's order do something to stop that? So the commission mandated that they were going to have to not count that towards the specific goal, but it still allows them to make spending on these electrification efforts that were limited by that provision of the Public Utilities Act. And in a more general sense, because I had said that there were two elements to this, the second element is that this is the first time we're interpreting this statute, and non-transportation electrification is a pretty big, open field. And so allowing non-transportation electrification could have really big consequences moving forward. If you just look at the Climate and Equitable Jobs Act, CJA, which created Section 45, also created the specific incentives that, the non-transportation incentives that are at issue here. There's a whole other slew of electrification efforts for increasing building energy efficiency and a ton of other things for solar power. So if non-transportation spending is allowed in these plans, then there's a possibility that it could then be included moving forward, and we could have even greater disparities in these plans of what's covered by the cap and what's not covered by the cap. So basically it all comes down to the cap, because they can move this expense somewhere else that the taxpayers or the rate payers are going to pay, customers are going to pay anyway, correct? Quite possibly, Your Honor. I mean, it depends on what the specific kind of programming is. Yes, but your concern, the EAG's concern is the cap. Yes, Your Honor, in particular. Couldn't the commission do in future cases what it did in this case? It could, Your Honor, but I think that that's only fixing part of the problem, because they're still spending on these specific kinds of electrification efforts beyond what the legislature intended them to, because it is capped under another provision. And that was explicit in the BE plan. ComEd said the amount that the commission set for the cap wasn't sufficient for us to meet the goal, the overall electrification goals that they set, so we want to spend more money on this thing that they told us we couldn't spend more money on. And, you know, the cap is there for a reason, and we're not supposed to be able to go beyond that cap. And that's to limit the impact on rate payers. Exactly, Your Honor. So I don't recall the exact figure, but there was a figure submitted by ComEd as to the rate payer increase. And, you know, we're required to consider consequences of different interpretations. So not knowing what that number was, what was the number on the other side, if we were to consider your interpretation? I don't think we have a specific number. Looking to the overall plan, separate from, you know, how each individual person would see an increase in their individual rates, if I may, Your Honor. Continue. Yeah. Under the commission's or the Attorney General's interpretation, the overall cap here would be $28 million. So, you know, that's even under the commission's larger retail rate impact amount, which they set at, I think, $44 million. The $77 million of the overall plan is still beyond that cap. Okay. Any additional questions? You argued in your brief and argued before the commission, you know, how ComEd would have basically a double recovery. Explain that. So the double recovery here was through, it was in part dealt with by the commission by declining, by requiring that the specific EE incentives not be, the money spent on those same electrification efforts couldn't go towards meeting those goals. But the double recovery is that they can still spend additional money beyond that cap and then recover that through the BE plan because they're still recovering all of the expenses on the BE plan. Thank you. I guess I have a hard time accepting your argument that despite all the language, which you characterize as general, in Section 45, that any non-transportation spending is absurd. So, I mean, you say that in your brief. But I guess, you know, more specifically, I noted that the Act 45-D-1 talks about energy cost savings and rate reductions that non-participants are supposed to get. How could transportation-related spending ever get non-participants anything? So to answer that specific question first. And then just, you know, my comment, if you want to speak to it, is absurd is a hard row to hoe, legally speaking. Sure, Your Honor. So the specific question first. I think the overall concept with these larger electrification efforts is that it's going to reduce rates over time by building up the infrastructure, encouraging people to use, do charging, and have other electric pulling efforts outside of peak times. Because when electricity is being used by a lot of people at peak times, that causes more expenses for everyone. And so by encouraging the buildup of this overall infrastructure and having these rate structures that, some of which are specifically targeted for EV charging, that's going to, in the long run, reduce costs for everyone. And then kind of more generally, for the focus of this Section 45 on transportation specifically, I want to push back on the characterization that there's a lot of kind of the generic, non-transportation-specific elements here. It really is, there's the six elements of the 15, or the mandatory programs in 45B, the definition. There's the six of those. The opening sentence of that definition in 45B. Six what? Six general? Yeah, the six general of the 15 total. So it's less than half? Less than half. Therefore, it's absurd? No, Your Honor. I mean, that's my concern. It's not that, you know, you're right. The overall, in my reading of the Act, is directed towards EVs, no question about that. But I am concerned that you're asking us to read out the other stuff when the statute as a whole, I don't necessarily see it as ambiguous. Yeah, and I understand that, Your Honor. I don't think that we are arguing that it's ambiguous. We are not arguing that it's ambiguous. We're arguing that it is clear when you look to the statute as a whole that the legislature intended to specifically be dealing with transportation and EVs only. You know, and again, they could so easily have said, this is what, you know, we mean. This is to be here and be part of the BEP, it has to be transportation related. But if I just look at the language, I have a hard time being certain about your conclusion. Yeah, I don't think they could have. But, you know, we don't think it was necessary because of that larger context. And I would point, Your Honor, to a number of the cases that we cite in our brief, you know, Corbett and Schettino, NBC, that these cases that are looking to the larger context of the statute to imply that limiting language. I hear your point, but I think it's the commission points out there's a definition here. Like, you know, for Corbett, there is no definition for trails. So they look to other like items in the list. But here we have a definition. But you're saying, oh, no, the definition itself has some words in there you need to kind of read my way. Because although it doesn't say it's forbidden, it really is. And so it seems like you're stretching. I understand that, Your Honor. But, you know, we think that that's a distinction without a difference here. Because this definition is over 300 words long. It's got 15 subparts. And it's not as a well-established principle of statutory interpretation to be able to look to the canons of interpretation to understand a definition. And to look to. The statute is ambiguous, yes. I don't think so, Your Honor. I think Wildermuth in particular is cited in our brief. We always look to the rules of grammar and to context to understand the plain meaning. Because language is contextual, depending on how and where it's used. So I don't think we need to get to ambiguity to get to these other, to get to these canons of statutory interpretation. Because those can be applied to get plain language. Meaning when we're understanding from context and looking at grammar and placement and those things. So, you know, we would argue that, again, this context where the 10 specific goals and the 15 things that the legislature wanted to be considered and wanted to recommend out of the workshops. The 10 elements that must be in a BEP. The restriction on spending in 45G. All the information the legislature wanted to have recorded once these plans were approved in F and H. All of these things are explicitly and exclusively focused on transportation and EVs. And then you have a few other generic elements sprinkled in. And the legislature believes that it would be understood contextually that they were all referring to the same thing. All right, thank you, Counsel Lee. You'll have time on rebuttal. Thank you, Your Honor. All right, the appellees are splitting their time. And I believe first will be Mr. Gons. All right. Please proceed when ready and feel free to adjust the microphone so that we can hear you. May it please the Court? Counsel? Good morning, Judge. My name is Brian Dodds. I'm here on behalf of the Illinois Commerce Commission. As Your Honor, I'm just going to counsel for Commonwealth Edison Company. Ms. Norma Woody and I will be dividing our time seven minutes to eight. With my seven minutes, I'll address the non-transportation spending issue in the Commons BE plan. That is the approval of the plan with respect to that non-transportation spending. Ms. Woody will address the retail rate cap issues raised by the Attorney General in this appeal. And, of course, should Your Honor have any questions, we'll do our best to answer them. Your seven minutes is up. Thank you. Justice Norman, I think you hit the nail on the head. The legislature means what it says with this statute. Electric Vehicle Act Section 45, just to step back a little bit, was passed as part of the Climate and Equitable Jobs Act in the fall of 2021. This is a landmark bill, changing quite a bit of actually what we do at the Commission, amending more than a dozen statutes, including the EVA, and creating this beneficial electrification plan. The EVA Section 45 definition at EVA 45B is broad, as Your Honor pointed out. The narrative part, the prose paragraph part of that references savings goals, grid operations, changing the load shape of customer usage, pushing from peak to off-peak times. That portion of the definition doesn't actually reference electric vehicles. The argument is that it's all in the context of electric vehicles. It is in the Electric Vehicle Act. It's not elsewhere, correct, the plan definition? To my knowledge, there was no other beneficial electrification. Right, and this was new, and it was newly introduced with the 2021 legislation. So the argument here is that it was placed in the Electric Vehicle Act. All of it relates at least primarily or secondarily could be tied directly to electric vehicles. So why is that not an expression of intent? So to the first part of your question, the title isn't dispositive if the plain language in sight, including the new amendments, contemplate beneficial electrification that's broader than transportation or EVs. There's only one case that we cite in our brief with that proposition, that the title of the statute isn't going to control to the contravention of the plain language of the terms inside the statute. To the second part, the Attorney General's point that this is exclusively related to EVs is only true if you close your eyes and ignore key parts of the text, namely beneficial electrification subpart B1's time of use rates. It has nothing to do with transportation necessarily. The B2 hourly pricing programs, the demand response programs, incentives for off-peak use, and I'll direct the Court's attention to B10. This is incentives for beneficial electrification in eligible communities. Eligible communities is a defined term in the statute, and it is defined geographically. It does not mention EVs. Wait, eligible communities is defined in the EVA? In the EVA, yes, Your Honor. It is defined geographically based on low-income or a disproportionate impact from pollution, environmental justice. It is defined geographically. We think that contemplates both transportation and fixtures in a home-built infrastructure, in residences and businesses. The kinds of programs that ComEd was approved, the non-transportation programs, they outline this actually very nicely in their brief at pages four to six, include residential BE technology and its corresponding infrastructure readiness and then commercial and industrial technology in the readiness programs. We're talking about high-efficiency heat pumps, electric lawn equipment, induction cooktops, commercial fryers, things like that. The question is not, is our electric vehicles and their related transportation infrastructure important to the statute? We agree they are. The question is, does the statute exclusively relate to those programs? Well, if it doesn't, as the AG says it does, what would the recommendation, would you suggest that they do? I'm sorry, can you rephrase, if it doesn't? If it doesn't, if it does include something other than electric vehicles, as the Attorney General's office proposes, should they not go to the legislature, ask them to change? Who's their they in this? Attorney General's office. Oh, absolutely. I mean, is it something we can change here? No, not without rewriting the statute, Your Honor. The statute at these points, and I'll just note that the B-15 concludes with other similar programs. It vests the commissions with some discretion to approve programs that are of the type of B-14. Right, so the catch-all provision you're saying expands beyond vehicles. So you cited time of use, hourly pricing, off-peak demand. I mean, if reading in the context of the electric vehicles, as the AG insists, there is some correlation there because they want people charging their cars at 3 a.m. instead of when everybody else is using electricity, right? And that's why time of use, hourly pricing, demand off-peak, all those things do arguably relate primarily to electric vehicle use, do they not? Primarily but not exclusively is our point. The problem is you have to come to this text with the lens of the EVA 45 is for EVs only already and then adopt the Attorney General's rewriting and gloss of specific in general. And even in the reply brief, they don't actually explain why reducing grid congestion or pushing to off-peak times is any less specific than trying to foster electric school buses. It isn't less specific. What we have is 14 specific types of programs and a catch-all general one that permits broader than what electric vehicles alone. Did that answer your question? Yeah, I think so. The other question I had was about the eligible communities. Again, my reading, not having it immediately in front of me, but that was in the context of promoting additional electric vehicle usage in communities that don't already have access, which makes sense because these are more expensive now. They tend to be in more expensive places. Do you want to address that? Sure. It is true that the statute is attempting to foster beneficial electrification and EV adoption in these eligible communities. The question is, is that all the statute is trying to do? What do you think the statute is trying to do? It is trying to foster beneficial electrification in a variety of types of technologies and build out the necessary infrastructure to anticipate the demands on our grid from that increased electrification. It is attempting the legislature through CJA and 45A. Let's see if my time is up. In the legislature through 45A, articulating goals, and B, this broad definition, and then even under reference D1, the public interest criteria, it is trying to push electrification of various types into communities that did not have access to it and reduce the barriers to entry for that. That includes EVs undoubtedly, and we already mentioned the $77 million approved budget. The problem is, if you adopt the AG's construction, you're reading out the millions of dollars of other programs. In the retail rate cap issue, you are reducing a $77 billion budget down to $28 million. It is very hard to imagine some of the broad CJA goals and the Electric Vehicle Act's goals being met if we essentially gut two-thirds of these programs. This is the inaugural comment BE process. This is the first appeal up. We're going to be living with this statute for Comet and AMR for the foreseeable future. There's no sunset provision in this. So we're trying to construe a statute, the commission holistically, in what will foster beneficial electrification to meet the expansive goals of the legislature. Fortunately, all we have to do is read the plain text of the statute to see that. That is not exclusively limited to electric vehicles. Go ahead. How do you alleviate the AG's fears of the cap and what Comet is doing with the cap? We will address the retail rate cap issue. I'll just say that the retail rate cap is designed to apply. The legislature was very clear. It applies to development of EV infrastructure. There is transportation-related programs that are not directly contributing to EV infrastructure, the educational programs your honors referenced, and then there are non-transportation programs that approve. There is a backstop in EVA 45D that they have to remain cost-beneficial, and this is an analysis that the commission does regularly. We understand what cost-beneficial means and what is in the public interest. We do this in a variety of proceedings. The combination of that backstop and the explicit list of 14 types of programs, the utility can't just cram everything in that they want and recover it from rate payers. There is guidance in this. It is an unambiguous statute, and the commission applied the plain terms to it. Did Corbett find the Tort Immunity Act ambiguous? I'm trying to remember if they used the term ambiguous, but I know that TRAIL, with respect to the Local Government Immunities Act in that case, was undefined. In Brains v. ICC, which the NHE relies on heavily again, your honors, in this court in the second district, the word I think it was commodities that the commission was construing was an undefined term. They did not have the benefit that we do with beneficial electrification. We think those cases are distinguishable, and we don't need to go to it. And it's very clear in the Supreme Court's decision in 2008, MAGA, that when the language is clear, you cannot resort to extrinsic aids of construction like the Attorney General wants you to do. We have to apply every term in the statute. And in particular, your honors' decision in Quality Saw says that when we have an unambiguous statute, you apply it without exceptions, limitations, or qualifications. That's what the commission did. It gave full effect to every term in the statute and did not try to rewrite it like the Attorney General is asking you. All right. If there's no further questions, thank you, and we'll allow counsel to step up. And please feel free to adjust the microphone if necessary. You may begin when ready. May it please the Court, Counsel. My name is Monique Woody. I'm the Assistant General Counsel representing Athlete Commonwealth Edison in this appeal. As stated by my colleague, Mr. Dodds, I will be addressing specifically why the commission correctly determined, first, that the phrase total annual revenue requirements includes all, not just one, of Congress' revenue requirements, and second, that the phrase that the development of electric vehicle infrastructure does not require the inclusion of all beneficial electrification plan investments. At bottom, this case presents this Court with a choice today, to either apply and interpret the law as the legislature intended or to rewrite it. What we know under Illinois law is that the former is the only correct answer. Turning to the first issue, Section 45G clearly intends to include all of Congress' revenue requirements. Section 45G expressly states that the retail rate impact from the development of electric vehicle infrastructure shall not exceed 1% of the total annual revenue requirements of the utility. To put it simply, a revenue requirement is simply the amount of money that a utility is required to collect for engaging in a particular act or service. And contrary to what the AG asserts, even as a delivery services utility, ComEd does, in fact, have more than one revenue requirement. For example, while we are a delivery services utility, we cannot deliver electricity that we have not purchased. And that is where our projected power purchase revenue requirement reflects. And that is just one example. On an annual basis, ComEd recovers several revenue requirements, including our easy rebate revenue requirement, transmission, collectibles, and a host of other revenue requirements, and those are all separate from and in addition to the delivery services requirement that the AG cites to, and they are all required activities under the law. So it is not only possible to have more than one revenue requirement, it is, in fact, mandated. And there is no basis in the law or the facts of this case to support a conclusion that a statutory reference, especially in its plural form, to a utility's total annual revenue requirements can and should only mean its delivery services revenue requirement. Section 45G is explicit in that acknowledgement, and the commission, who is intimately familiar with the utility's revenue requirements, including what they are, what they include, and how they are calculated, correctly determined that it should be included in that calculation. The AG has also asserted that the commission erred by including riders in its interpretation of total annual revenue requirements. In this case, again, that is not supported by the plain language of the text, and there is no meaningful distinction between the two. Both rates and riders are methods of cost recovery. They both, again, going back to that simple definition, represent amounts of money that a utility is required to collect for engaging or providing a particular service, and they both can and do have their own revenue requirements. Is revenue requirements defined in where, may I ask? I know there is a case that seems to offer a definition of it. Is there a statute as well? There is not a statute. It is a term of art that is used amongst the commission and in the utility regulatory industry. But, again, this is why it's important that we rely on the commission's expertise, as they deal with these revenue requirements on a regular basis, and they know what they include. The AG doesn't actually dispute ComEd's definition of a revenue requirement. If you look to page 59 of their brief, they agree that a revenue requirement is an amount of money that we're required to collect for engaging in a particular act. What we disagree on, however, is whether or not we have more than one, and as previously stated, we certainly do. If you want to think about it in terms of, you know, in a simple illustration of your bill, you don't get a bill from ComEd and see just a delivery service charge. You see a supply section, you see a delivery section, and you see several other line items. Each of those line items have their own charges because they all go to different buckets of money because they all have separate revenue requirements. Is that percentage? So typically what we see on our bill is a dollar amount. Right. But do they reach that dollar amount by a percent? It depends, Your Honor. So sometimes the revenue requirement typically reflects like a dollar amount overall that the utility is required to collect. Some statutes dictate how those costs should be allocated amongst the customer, so it can vary depending on which one we're – which charge we're talking about. So in this argument that the AGs assume or presume that you're going to exceed the cap, can you talk to that? Absolutely, Judge. The AG asserts that we should be concerned about the commission's interpretation because it may lead to excessive spending or that the cap has been miscalculated. But there's more money on the customers. Correct. So if we look to Section 45G, while it does – just to back up to the ratepayer impact, Section 45, if we look specifically to D1, as a part of the cost-benefit analysis, it actually requires that the commission consider the net benefits that will come from beneficial electrification plans, and it actually says that a part of that consideration is impacts on customer rates. So the AG's assertion that there's no consideration of spending that goes in – no consideration of customer rate impacts that goes into comments, beneficial electrification plan investments or spending is unfounded. It's also important to note that – Excuse me, before you leave that, I'm sure the fault is mine, but you said D1? Yes. I'm sorry, D8. I apologize, I misspoke. D8. Thank you. Provide resources to support investment in charging equipment. Correct. So the 627-45D8 requires that, as a part of the cost-beneficial analysis, that the commission consider the impact on customer rates that will result from the beneficial electrification plan investments. Yes. So in addition to that consideration, the AG's concerns regarding excessive spending or not abiding by – or having a cap that's too high is unfounded. It's also important to note that what we're talking about here is kind of the upper limits, right? We're talking about what a hard cap, turning to my second issue, the development of infrastructure, EV infrastructure would be. That doesn't necessarily mean that comments spending will always spend every penny up to that dollar amount. Comments, plans, and spending and program proposals are always based on our customers' needs and are based on what we are required to do by law. And they are always required to be approved by the commission. And going back to that statute that I referenced earlier, the commission has to consider both, not just whether or not comments overall beneficial electrification plan is cost-beneficial, it also has to decide whether or not it is in the public interest. And if we look to Section 45G, a part of that consideration is whether or not the commission has to determine whether or not the levels of cost recovery associated with our BE plans is appropriate for customers as well. So are you – so is part of your argument that – a counter to theirs, I guess, is that there's an incentive, their argument, to increase spending through the BE plan that would otherwise not be recoverable and they're seeking additional recovery because it is captioned under BE plan. So do you want to address that and how – besides the cost-benefit analysis, how else is that fear allayed? Yes, in two ways, Justice Kennedy. First, the agency's concerns about double-counting of recovery related to programs under the EE statute. First, the EE statute and the beneficial electrification statute actually have two different focuses. There's no counting of savings on beneficial electrification plans like there is under EE plans. Second, the counting of savings, if you take a look at the public utilities energy efficiency provisions, that actually only counts savings that actually decrease kind of your whole home electricity usage. For many customers who adopt electric vehicles and will be charging at home, it may actually have the opposite effect. Now, of course, the flip side to that is that perhaps they save money on fuel costs. But the programs under the beneficial electrification plan and under the EE statute actually have two different goals. So there is no double-counting of savings. And as Justice Kennedy, you noted earlier, the commission actually directed Condit not to double-count those savings in the first place. The second reason why we shouldn't be concerned about excessive spending or not abiding by a cap is that the commission has always had the authority to decide that programs or investments that a utility proposes are not appropriate. Now, the agency seeks to minimize that authority, but Illinois law doesn't support that particular position. Because if we look to the 2016 case of Commonwealth Edison v. Illinois Commerce Commission, that court recognized that the entire reason we defer to the commission is because of their expertise and experience in assessing whether or not proposed programs or investments are appropriate. We cannot minimize or say that it is not significant for the commission to exercise its discretion. The General Assembly gave the commission the authority that it has for a reason. And we should rely on that and we should trust that. We believe the statute is plain on its face and clearly supports the commission's determination. But even if this court finds that it is ambiguous, we will request that you abide and abide by the commission's determination and affirm it today. Thank you. All right. Thank you, counsel. Sorry, one last question. Oh, go on. That total annual revenue requirements, is that something different than revenue requirement? Like requirement? Yes. The total annual revenue requirements, again, reflects kind of the plurality and takes into consideration that we can't have more than one revenue requirement. The AG asserts kind of two things. They first assert that because we're a delivery services only utility, we can only have one, which is kind of what we addressed earlier. And then in a prior brief, they also assert that what the statute could be referring to is a multi-year rate plan and then the additional reconciliation revenue requirements that come after that. But what we would like to point out is that that actually does not comport with kind of the practical realities of what we're looking at prospectively. Under Section 108.18 of the Public Utilities Act, after the initial multi-year rate plan, an electric utility does not have to have another multi-year rate plan. So it's very possible that moving forward, we will not have a four-year prospective looking plan. We could choose to do a traditional rate making, in which case we would have a rate that is set, we actually don't have a reconciliation, and we would only have a singular revenue requirement. So it doesn't make sense to then say the total annual revenue requirements means the four, the annual revenue requirements that we have from a four-year plan. Thank you. Thank you. All right. Thank you, counsel. Mr. Jacobson or Baum. So I'll start if I may with the total annual revenue requirements, since that's fresh. I think there's been a mischaracterization of the AG's argument here. We don't think that Comet only has a single revenue requirement. It's just that as a delivery services utility, they only have delivery services revenue requirements. And as we outlined in both our opening brief and in our reply brief, that includes the multi-year rate plan. Each year within that plan has its own annual revenue requirement. So that gets to multiple. And the multi-year rate plans were also implemented through CJA. So when the legislature was putting together Section 45 and putting it into the statutory scheme, they were explicitly aware of the fact that they were creating multiple annual revenue requirements through those rate plans. But even in the general rate case, the traditional single-year rate case, you're going to have more than one annual revenue requirement, as my colleague indicated, because you have the original revenue requirement and then the reconciliation revenue requirement. And if you look back at commission decisions, they refer to revenue requirements, plural, in that sense. And then going more generally to revenue requirements, I would like to point out that in the response briefs, there's been no identification of authority or commission decision pointing to a different kind of revenue requirement. All of these other rates and charges that they've been referring to as having different revenue requirements, they're not referred to as having revenue requirements. They're referred to as the riders, pass-through charges, and other things like that, that in the case law, including in the commission decisions that we've cited, cannot impact the revenue requirement and are separate from the revenue requirement. So they are different buckets of money, and they are considered differently and independent of one another. So when the legislature used that term revenue requirement, it is a term of art that refers to a specific subset of rates that the utilities have. And here, because ComEd's a delivery services-only utility, that's the only kind of revenue requirement they have. Does total annual add anything to the discussion? It does, Your Honor. It then gets you to every single one of their annual revenue requirements, because with the multi-year rate plans that were added through CJA, they're going to have multiple annual revenue requirements included in each rate plan, and they have an annual revenue requirement for every year in that plan, and then they also have the reconciliation revenue requirements. And again, as the experts here, ComEd and the commission, they have not cited a single authority, either a decision or a statute or an opinion from the appellate courts, identifying a different kind of revenue requirement or what those other revenue requirements are. The only authority we have is. . . I actually had a question where I was going to. . . You know, I realize you do cite some case law and so forth, but some of your discussion refers to your own brief, which refers to your motion, a response to a motion. But basically what I hear kind of all of you saying is it's a term of art, which I must assume the commission might, you know, have a handle on as well. They do, Your Honor, but again, they haven't pointed to any kind of authority to support their position that the revenue requirement can include these other kinds of rates and charges, whereas the authority that we do have says that they're separate and they need to be independent. These other kinds of rates and charges are independent from revenue requirements and cannot impact the revenue requirement. Mr. Jacobson, as we know, our standard of review is de novo, but aren't we to give substantial deference to the commission? So certainly if the language is ambiguous, you give substantial deference to the commission. But on de novo review, if the plain language is there, the plain language controls no matter what the agency here, the commission. Would it be a determination as to what spending is appropriate and cost-benefit, et cetera? I think the cost-benefit analysis is certainly a very deferential decision, but we're not here dealing with what specific spending in the plan was cost-beneficial or not. We're looking at the interpretation of whether or not what the language in the statute specifically means. And if you have any more questions. Thank you very much, counsel. I want to thank all the parties for your arguments. We will take the case under advisement and make a decision in due course. The court will stand in adjournment today. All rise.